JAMES C. YOUNG, Appellant, v. NELS CHARNQUIST.

**Swamp Lands:** AUTHORITY OF INTERIOR DEPARTMENT TO DETERMINE: *Estoppel of State.* Acting under the Acts of the General Assembly of Iowa granting swamp lands to the respective counties wherein situated, a county claiming a tract as swamp land under the act of Congress of September 28, 1850, granting swamp land to the several states, sold the land to a purchaser, who, after paying taxes thereon for several years, abandoned it; and plaintiff afterwards purchased it at a sale for delinquent taxes. A railway company claimed the tract as indemnity land under the act of Congress of 1856 granting lands to aid the construction of certain railroads, and after plaintiff took possession of the land the selection of the railroad was allowed, and the land certified to and accepted by the state as railroad land by the interior department. *Held,* that the interior department had full authority to determine whether the land was swamp land, and did determine that it was not, by so certifying it to the state, and that, after accepting the land under such certificate, the state could not claim it as swamp land, nor could it give the right to another to make such claim.

PURCHASER AT TAX SALE: *Notice.* Where a land grant railroad company selected land within the indemnity limits, and thereafter, and before its selection was allowed and the land certified to the state for it, the land was sold for taxes, on the supposition that it was swamp land, it having previously been sold by the state as such, the purchaser at the tax sale is bound by subsequent decision of the department of the interior awarding the land to the railroad company, though he had no notice of such proceedings.

*Same.* Land the title to which is in the general government is not taxable, and the purchaser at a tax sale of such land, acquires no title thereto.

**Title to Railroad Grant:** ISSUE OF CERTIFICATE: *Adverse possession.* Where land lying more than six and less than fifteen miles from a land grant railroad is certified by the United States to the state for such road as indemnity lands, the title to such land does not pass from the United States until such certificate is issued, and prior to such time no person can acquire title to such lands by adverse possession.

LACHES OF OWNER. Where a land grant railroad company selected a tract as indemnity land in 1878, and thereafter persistently

urged its claim thereto upon the general government, it should not be found guilty of laches, as against one who entered on the land in 1887 under a supposed tax title, though the land was not certified for the company until 1891, because of delay in the interior department in determining the company's right to the land.

*Same.* In 1891 a railroad received a certificate for indemnity lands which it had selected in 1878, and soon after actions were commenced involving the validity of its title to some of such lands, final decisions being rendered in 1896. In 1887 plaintiff entered into possession of a tract of the land so certified, under a void tax deed, and continued to improve such tract. Immediately after the decision of such actions plaintiff began negotiations to adjust the adverse claims to such tract, and, on failing, commenced an action to quiet his title. *Held,* that the railroad company was not guilty of laches in the assertion of its title to the land, and, the period of limitations not having run since the government parted with its title, plaintiff should not recover.

**Grantee in Quitclaim:** NOTICE OF EQUITIES. A purchaser of land, taking possession under a quitclaim deed is not entitled to protection against higher equities though he purchased in good faith.

**Tax Sale:** INSUFFICIENT REDEMPTION NOTICE. Where the notice of expiration of the period of redemption from a sale of land for delinquent taxes is not addressed to the person in whose name the land is taxed, a tax deed issued on such sale is invalid.

*Appeal from Webster District Court.*—HON. S. M. WEAVER, Judge.

MONDAY, MAY 20, 1901.

THE northeast $\frac{1}{4}$ of northeast $\frac{1}{4}$ of section 35, in township 87 north, of range 29 west, of fifth P. M. is claimed by plaintiff under act of congress approved May 15, 1856, known as the "Railroad Land Grant," accepted by the state, and transferred by it to the Dubuque & Pacific Railroad Company, and subsequently by it to the Dubuque & Sioux City Railroad Company. The road was completed through Webster county in 1869, and this land is within the indemnity, not the place, limits—that is, .

more than 6 miles from. the line of definite location, and
within 15 miles therefrom—and was not selected until Au-
gust, 1878, being then included in a supplemental list.
The clerks of the railroad division of the land department
on October 26, 1891, certified to the commissioner of the
land office that it, with other tracts, were "vacant, unappro-
priated lands, and subject to selection under the grant," and
this was approved by the chief of the division.   Also the
chief of the swamp-land division certified that the "foregoing
list of selections has been compared with swamp-land rec-
ords of this office, and found to be free from conflict there-
with."   On the same day the commissioner made certifica-
tion to the state for the railroad company, and this was ap-
proved by the acting secretary of the interior November 14,
1891.   The railroad conveyed its interest in the land by
quitclaim deed February 19, 1892, to William Ragan, and
the latter executed a warranty deed to plaintiff March 2d,
following.   The defendant, on the other hand, claims title
under what is known as the "Swamp Land Act," approved
September 28, 1850; the various acts of the general assembly
of Iowa granting swamp and overflowed lands to the respec-
tive counties wherein situated; conveyance   by   Webster
county to John F. Duncombe December 24, 1860; from
Duncombe by quitclaim deed to Ringland; and by warranty
deed from the latter to S. H. Kerfoot September 6, 1861.
It appears that Kerfoot paid the taxes up to 1874.   It was
sold for the taxes of 1879 and a tax deed executed by the
treasurer to Rhomberg April 10, 1885, and recorded the
following day.   The notice of the expiration of the period
of redemption, as published in October, 1884, was addressed
to E. C. Litchfield, though the land appeared on the tax
lists to have been assessed in 1884 to S. H. Kerfoot.   Rhom-
berg conveyed to the defendant by quitclaim deed, in con-
sideration of $150, July 8, 1887.   It is conceded that the
defendant purchased in good faith, on the supposition that
the land was subject to taxation.   He fenced it the same

year, erected a stable in 1888, a granary in 1890, and has since constructed sheds, dug wells, set out shade trees and shrubbery, and dug a ditch—in all, expending nearly $500 in improvements; also paid the taxes since his purchase. This action to quiet title in plaintiff was begun April 30, 1898. Like relief was sought by defendant, and by the court decreed. The plaintiff appeals.—*Reversed*.

*Wesley, Martin* and *Wright & Nugent* for appellant.

*Maurice O'Conner* and *Frank Farrell* for appellee.

LADD, J.—In harmony with what was supposed to be the construction of the supreme court of the United States in *Railroad Co. v. Smith,* 9 Wall. 95 (19 L. Ed. 599), this court has hitherto held that the swamp land act of congress approved September 28, 1850, operated as a grant in *praesenti* to the respective states of swampy and overflowed lands, and passed title *ex proprio vigore.* *Railroad Co. v. Brown,* 40 Iowa, 335; *Page County v. Burlington & M. R. Co.,* 40 Iowa, 520; *Snell v. Railway Co.,* 78 Iowa, 88; *Emigrant Co. v. Fuller,* 83 Iowa, 599; *Hays v. McCormick,* 83 Iowa, 89; *Young v. Hanson,* 95 Iowa, 717. This view seems to have been somewhat confirmed by *Wright v. Roseberry,* 121 U. S. 488 (7 Sup. Ct. Rep. 985, 30 L. Ed. 1039), wherein like decisions in several states are referred to. But in *Chandler v. Mining Co.,* 149 U. S. 79 (13 Sup. Ct. Rep. 798, 37 L. Ed. 657), the previous opinions of that court are reviewed and explained, and the conclusion reached that "the plaintiff in error could not properly establish by oral evidence that the land in dispute was swamp land, for the purpose of contradicting and invalidating the department's [interior] certification hereof to the state, and the latter's patent to the canal company." The question was next before that court in *McCormick v. Hayes,* 159 U. S. 332 (16 Sup. Ct. Rep. 43, 40 L. Ed. 176), involv-

ing this identical grant for railroad purposes; and it was said that "upon the authority of former adjudications, as well as upon principle, it must be held that parol evidence is inadmissible to show, in opposition to the concurrent action of the federal and state officers having authority in the premises, that these lands were in fact, at the date of the act of 1850, swamp and overflowed grounds which should have been embraced by Linn county in its selection of land of that character, and withheld from the state as lands granted expressly in aid of railroad construction within its limits." Again, in *Rogers Locomotive Mach. Works v. American Emigrant Co.,* 164 U. S. 559 (17 Sup. Ct. Rep. 188, 41 L. Ed. 552), appealed from this court, the decisions were exhaustively reviewed, and that court, speaking through Mr. Justice Harlan, said: "The emigrant company lays much stress upon that clause of the railroad act of 1856 exempting from its operation all lands previously granted by the United States for any purpose. And upon this foundation it rests the contention that no lands embraced by the swamp act of 1850 could, under any circumstances, be withdrawn from its operation, and certified to the state under the railroad act of 1856. This contention assumes that the lands in controversy were, within the meaning of the act of 1850, swamp and overflowed lands. But that fact was to be determined in the first instance by the secretary of the interior. It belonged to him, primarily, to identify all lands that were to go to the state under the act of 1850. When he made such identification—then and not before—the state was entitled to a patent, and on such patent the fee-simple title vested in the state. The state's title was at the outset an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued. But it is equally clear that when the secretary of the interior certified, in 1858, that the lands in controversy inured to the state under the railroad act of 1856, he, in effect, decided that they were not embraced by the swamp

land act of 1850. * * * The state was entitled to the lands either under the act of 1850 or under that of 1856. It was open to it, before accepting the lands under the railroad act, to insist that they be passed, under the act of 1850, as swamp and overflowed lands. No such claim was made. The state—the party primarily interested, and with whom the land department directly dealt—accepted the lands under the act of 1856, and therefore not as inuring to it as swamp and overflowed lands, within the meaning of the act of 1850, and, as just stated, has never repudiated its action of 1858, nor sought to have reopened the question necessarily involved in the action of the secretary when he certified the lands to the state under the act of 1856. It would seem that, upon every principle of justice, the action of the secretary of the interior in certifying these lands to the state under the act of 1856 should not be disturbed. The fact that his certification was made subject 'to any valid interfering rights which may exist to any of the tracts' embraced in his certificate does not affect this conclusion. That reservation could not have referred to any rights which the state acquired or could have asserted under some other act of congress than that of 1856. Certainly it was not intended by the interior department to certify the lands under the railroad act of 1856, subject to the right of the state, while holding them under that certificate, to claim them under some other and prior act. The action of the department in 1858 was intended to be final, as between the United States and the state, in respect to the lands then certified as railroad lands. If the state considered the lands to be covered by the swamp-land act, its duty was to surrender the certificate issued to it under the railroad act. It could not take them under one act, and while holding them under that act, pass to one of its counties the right to assert an interest in them under another and different act"—and, after declaring the grantees would be in no better situation than the state, concluded: "We are of

the opinion that the supreme court of Iowa did not give proper effect to the action of the interior department in 1858. It should have been adjudged that, so far as the lands in controversy are concerned, the plaintiffs, claiming under the county of Calhoun and the state, as well as under the act of 1850, were concluded by the act of the secretary of the interior when he certified such lands as inuring to the state under the railroad act of 1856, and by the act of the state in accepting and retaining the lands under that act. Consequently the suit should have been dismissed for want of equity, with costs to the respective defendants." See also, *Brown v. Hitchcock,* 173 U. S. 473 (19 Sup. Ct. Rep. 485, 43 L. Ed. 772). The result of these decisions is that the ruling of the interior department on the issue as to whether the land is of a character such as to bring it within the swamp-land act must be treated as a finality, and that this issue is necessarily involved in certifying lands to the state under the railroad-land grant of 1856. The time within which swamp and overflowed lands are to be patented to the state is not fixed by the act of 1850, nor is there such limitation in the land grant under consideration. It might then have been passed upon by the interior department as late as 1891, and under the decisions of the federal court the certification of the 40 acres in controversy to the state for the railroad company, if the result of a proper hearing on due notice, is to be regarded as a determination that it was not within the swamp-land grant, and that decision may not be questioned by parol evidence.

II. The defendant pleads that he has been in adverse possession for more than 10 years. But up to 1891 the legal title was in the United States, and it is well established that neither the plea of laches nor that of the statute of limitation is of any avail against the general government. *U. S. v. Insley,* 130 U. S. 263 (9 Sup. Ct. Rep. 485, 32 L. Ed. 968); *U. S. v. Dalles Military Road*

*Co.,* 140 U. S. 599 (11 Sup. Ct. Rep. 988, 35 L. Ed. 560).

Had this land been in the place limits, a different question would have been presented. As it was beyond six miles from the line of definite location, its selection and certification were necessary to pass any title.

III. The jurisdiction of the department of interior to pass on any question relating to the title to this land is challenged on the ground that there is no affirmative showing of notice of the proceedings to the defendant, or those under whom he claims. It is to be said in response to this that the proceedings were pending and the grant in process of adjustment before defendant took possession of the land. The selection was made in 1878, six years before the void tax deed to Rhomberg. The legal title never passed to Kerfoot. He has made no claim to the land since 1874, and is not now complaining. As the state accepted the certificate under the railroad grant, it cannot be heard to object that the tract was not transferred to it under another grant instead, without first tendering back the certificate, or in some way declining to accept the land thereunder. *Rogers      Locomotive      Mach.      Works v. American      Emigrant      Co., supra.* As Rohmberg obtained the tax deed six years, and defendant went into possession under his quitclaim deed nine years, after the selection of the lands by the railroad company, and pending the decision of the department, whatever rights either acquired were subject to the adjustment of the grant of 1856, and the decision as to who was entitled to the lands selected. Neither then was entitled to notice.

IV. But it is contended that the railroad company has been guilty of laches. Its road was completed through Webster county in 1869, and it was entitled to this land, if at all, at that time. The excuse made is that before the decision in *Wolcott v. Navigation Co.,* 5 Wall. 681 (18 L. Ed. 689), the company supposed it had acquired all the land earned. But the opinion in that case

was filed May 13, 1867, and the selection of these lands was not made until 1878—eleven years thereafter, and nine years after the completion of the road. Its agent, Ragan, then demanded certification to the state, but a rule of the department required that this be not made within six months after the selection. Again, in March, 1879, he urged action, but this was refused until it might be "ascertained whether the said company has not received an excess of indemnity lands under its grant." The matter was then placed in hands of attorneys at Washington. What they did appears in four letters addressed to Ragan, dated October 31, 1882, April 24, 1883, September 11, 1883, and September 10, 1884, respectively, in which he is assured they had repeatedly pressed the matter upon the attention of the department. In the last it is said, "The clerk making the computation has reached a partial conclusion," naming it. Ragan again visited the land commissioner in October, 1884, but was informed on June 4th of that year that "nothing could be done until the grant was fully figured over by the aid of a diagram." Nothing further was attempted until 1887, when, to a formal letter asking for the certification, the commissioner responded: "This office must decline to certify any more lands for the use of the Dubuque & Sioux City Railroad Company until after a final adjustment of its grant, for the reason that said company has, it is believed, received all the lands to which it is entitled. The adjustment will be completed as early as practicable." In response to another inquiry made in September, 1889, he was advised that the adjustment of the grant had just been submitted to the secretary of the interior "for his consideration and action under the act of congress approved March 3, 1887." Ragan again visited Washington in October, 1889, when he was advised that the matter "would be taken up in the course of the business of the office"; and again, in the spring of 1891, he was promised by the secretary of the interior "that the matter should be soon attended to." In No-

vember, 1891, certification was made. The only delay unexplained is that prior to 1878. But no one was injured by that. Neither Kerfoot, who then claimed the land, nor any one under him, is now complaining. The pretended title under which the defendant claims originated at the tax sale of. 1879. At that time selections had been made by the railroad company. What was done subsequently clears, as we think, that company of any want of diligence. The delays were incident to the transaction of the business in the government offices. The letters of the commissioner in 1884 and 1887 show conclusively that nothing might have been accomplished by greater persistence on the part of the company or its agent. Moreover, it is to be noted that defendant is not in a situation to complain of anything that had occurred prior to the time he obtained the deed from Rhomberg, in August, 1887. He acquired nothing under that deed. (1) As title had never passed from the government the land was not taxable. (2) If the land were taxable, the tax deed to Rhomberg, his grantor, was invalid because of the failure to give notice to the person in whose name the land was taxed. *Heaton v. Knight,* 63 Iowa, 686; *Id.* 65 Iowa, 434; *Reed v. Thompson,* 56 Iowa, 455; *Kessey v. Connell,* 68 Iowa, 430. (3) He took possession under a quitclaim deed, and therefore is not entitled to protection against prior equities. *Steele v. Bank,* 79 Iowa, 339; *Wickam v. Henthorn,* 91 Iowa, 242. Title was in the government, and the secretary of the interior was then withholding this and other lands, pending the adjustment of the grant prior to and after the act of congress approved March 3, 1887. Apparently, from that time till certification of the land to the state matters took their usual course in the department of interior, and nothing the company might have done could have hastened the action of the secretary. There was, then, no laches of which defendant might complain prior to November 14, 1891. This action, however, was not begun un-

til April 30, 1898. But cases were pending in court involving some of the lands included in the supplemental list. See *Young v. Hanson*, 95 Iowa, 717, in which opinion was filed October 15, 1895, and *Bourne v. Ragan*, 96 Iowa, 566, opinion filed January 22, 1896. Later that year (December 7, 1896) the opinion of the supreme court of the United States in *Rogers Locomotive Mach. Works v. American Emigrant Co.* was announced. The plaintiff thereupon immediately began negotiations for the adjustment of the adverse claims to this land, and, when these failed, instituted this suit. Under the circumstances shown, we think the period of the statute of limitations should control, and plaintiff be accorded the right to maintain an action begun within 10 years from the time of acquiring title. We are not to be understood as exonerating the railroad company from guilt of laches, when urged by an owner in a situation to complain. On the contrary, see *Bourne v. Ragan*, 96 Iowa, 566; *Young v. Hanson*, 95 Iowa, 717. "Laches" is a relative term, and what we do hold is that the defendant is not in a situation to complain of any delay in the matter of selecting the tract in controversy under the railroad grant and that since then there has not been such procrastination as to justify denial of relief prayed.—REVERSED.