N. M. HART, Appellee, v. M. O. DELPHEY ET AL., Appellants; and W. S. HART, Appellee, v. M. O. DELPHEY ET AL., Appellants.

**Public lands:** DECISIONS OF INTERIOR DEPARTMENT: CONCLUSIVENESS.
1  The state courts are bound by a final decision of the Interior Department that lands are in fact swamp and subject to selection under the swamp land Act.

**Same:** SWAMP LANDS: GRANT: TITLE. The grant of swamp lands under the Act of Congress of 1850 was a present grant, the legal title however remaining in the Government until selection by the counties for the purpose of identification; but upon obtaining legal title by selection it relates back to the grant itself.

**Same:** TAXATION. The fact that the title to swamp land when acquired relates back to the grant by Congress will not of itself validate a sale of the land for taxes, made while the title stood in the Government or county; as during that time the land was exempt from taxation.

**Same:** SWAMP LAND GRANT: EFFECT. Under the swamp land Act of 1850, requiring selection and proof of the character of the land before patent to the state, the general government holds the legal title in trust for the state and county until the selection is made and the patent issued.

**Same:** CONFLICTING TITLES: ESTOPPEL. A wife holding a quitclaim deed from the county conveying swamp land, made after the patent issued to the county, is not estopped from challenging the validity of a tax deed under a sale made when the land was not subject to taxation, by reason of the fact that her husband had made an invalid homestead entry upon the land. Besides the estoppel pleaded was of no avail because the plaintiff must recover, if at all, upon the strength of his own title.

**Same:** TAX TITLE TO SWAMP LAND: PROOF. The holder of a tax title to swamp lands can not rely thereon, in the absence of a showing that during the years for which the lands were taxed the state and county had parted with their title, or were estopped from claiming title thereto. In the instant case the evidence shows that the county had parted with its title to one of the lots in question, but not to the others, when the sales under which plaintiff claims were made.

**Same:** ESTOPPEL. Where the county sold and retained the purchase price of swamp land, and thereafter listed and assessed the same for taxes, it was estopped from claiming that the land was not sold and not subject to taxation, as against the holder of the tax title; and the county's grantee was subject to the same estoppel.

**Same.** Where the county made executory contracts for the sale of swamp land which were never performed, and the deposits made thereon were kept intact and finally refunded, but the county levied assessments and sold the land at tax sale, it was not thereby estopped to deny that it had parted with its title or that it was subject to taxation.

**Taxation:** SALES: _Caveat emptor._ The doctrine of _caveat emptor_

9  applies to purchasers at a tax sale, and they therefore take no interest in lands not subject to taxation.

*Appeal from Allamakee District Court.*—Hon. L. E. Fellows, Judge.

SATURDAY, JUNE 8, 1912.

THE first of these actions was brought by Mrs. N. M. Hart to enjoin defendants from trespassing upon certain lands in Allamakee county, Iowa, and the second action was brought by Mr. Hart, more than four years thereafter, to establish his title to another tract of land in said county against the defendants, and to cancel a redemption from tax sale claimed to have been made by said defendants, or one of them, and also to quiet his title to said land.  Shortly before the bringing of the second suit, plaintiff amended her petition in the first one asking that her title to the property in controversy be quieted in her and for other equitable relief.  Mrs. Hart claimed to be the absolute owner of the property described in her petition, and Mr. Hart the owner of the property described in his petition in virtue of certain tax deeds.  The defendants denied plaintiffs' ownership of the lands and pleaded title and right of possession in themselves.  They each pleaded an estoppel of each of the plaintiffs to assert title, and in replies filed by plaintiffs they pleaded that defendants were estopped. Upon trial to the court there was a decree for each of the plaintiffs as prayed and awarding damages against the Delpheys in the sum of $300 in favor of Mrs. Hart, and defendants appeal.  *Reversed* in part; *Affirmed* in part.

*J. P. Conway, D. J. Murphy* and *H. H. Griffiths,* for appellants.

*William S. Hart,* for appellees.

DEEMER, J.—While the facts are not seriously in dispute, they are complicated and difficult to state with any degree of clearness. The land in controversy is an island in the Mississippi river near the west bank thereof, and this island is described as lots 5, 6, and 7 in section 26, township 97, range 3 west. Mrs. Hart claims to be the owner of lots 5 and 7, and Mr. Hart of lot 6, and the basis for each claim is a tax deed or deeds for said lots executed as hereinafter set forth. Defendants Delphey claim to own the same by purchase from the county and by reason of having homesteaded the same under circumstances hereinafter to be related. Each also claims that the other is estopped from making any claim to the lands. One of the claims of all parties is that the lands were "swamp" in character, that they passed from the United States government to the state, from the state to Allamakee county, and from Allamakee county to certain purchasers; and the records disclose that Mrs. Delphey has the paper title, from the United States government, passing through the channels above indicated. The main reliance of the plaintiffs is upon tax deeds issued to them at various times, which defendants say were and are invalid because the lands were not subject to taxation at the times the taxes were levied against them. While defendants are relying upon a homestead entry which we shall presently consider, they, or at least one of them, is relying upon a patent from the United States government issued to the state under the theory that the lands were not subject to homestead entry, but were swamp lands, which passed to the state and county and afterward to Mrs. Delphey. So that the first question in the case is: Assuming the lands to be "swamp" in fact, when did the title to the same pass from the government and become subject to taxation? The patent did not in fact issue from the United States government until October of the year 1907, and the state patented the lots to the county in November of the same

year. However, an approved swamp land list was issued by the United States and sent to the state of Iowa in April of the year 1907, and in September of the same year Allamakee county quitclaimed all the lots to Mrs. Delphey for the sum of $200 in cash paid by her. If this were all of the case, it would not be difficult of solution, for it is clear that under such a record the lands were not taxable before the year 1907, and the tax deeds under which the plaintiffs' claims were issued upon sales for taxes levied not later than the year 1901. In order, then, to recover under their tax deeds, plaintiffs must show that the lands were subject to taxation at the time the taxes were levied against them. That they were assessed by the county from the year 1879 to 1899 to unknown owners, and from 1899 to the time of the commencement of these actions to one or the other of the parties litigant, is not disputed. But it is also known that for the years 1894 to 1909 the lands were listed by or at the instance of Mrs. Hart, who then claimed to have an interest in part thereof, or to be one of the owners of two of the lots under a tax deed or deeds from the county.

The following facts are relied upon as showing that the lands were subject to taxation: It is said that, by reason of the character of the island, the lands comprising the same passed to the state of Iowa under the swamp land grant of the year 1850; that the state granted the same to the county; and that the county sold the several tracts at different times and to different buyers at various times —all as shown by the swamp land record still preserved in the office of the county auditor of Allamakee county. It is true that this copy of the swamp land list which was found in the county auditor's office shows the following with reference to these various lots:

| Des. | Sec. | T. | R. | A. | Val. | Date. | |
|------|------|----|----|----|------|-------|---|
| Lot 6 | 26 | 97 | 3 | | 26.50 | 3-8-'64 | Millet & Williams sold by S. L. C....$33.12 |
| Lot 5 | 26 | 97 | 3 | 56.44 | 50 | 8-8-'66 | Rec'd. Treas'r E l i z a b eth Klett, Dep't. 28.22 |
| Lot 7 | 26 | 97 | 3 | 29.03 | 75 | | Guthneck & H e r t z o g, Dep't. ..... 21.73 |

This list contains description of eighteen different tracts, and with one exception they are marked in one or the other of these methods, "sold," "sold deeded," "deeded," or "deposit." In connection herewith, we here reproduce a receipt from Guthneck which is found in the record: "$21.73. Office of County Auditor. Harpers Ferry, Iowa, December 29, 1909. Received of S. K. Kolsrud, county auditor, Allamakee county, Iowa, twenty-one and 73-100 dollars, in full payment for money deposited with the auditor of said county years ago to purchase Gov. lot 7, section 26, township 97, range 3. Herbert Guthneck."

About the only other evidence of the sale of these lots by the county is: The assessment thereof for about thirty-three years, the payment of taxes thereon by the following named persons: Dayton, Tobiason, Ratcliffe, Hart, and the Delpheys. And tax sales of the lots or some of them in 1880 to Dayton; in 1888 to Tobiason; lots 5 and 7 in 1894 to William S. Hart & Co.; and lot 6 to Ratcliffe; in 1900 an undivided 1/60 of lot 6 to Hart; and in 1901 the remaining 59/60 of the lot to Hart. Plaintiff's title to lots 5 and 7 is based upon a tax deed issued in 1897 upon the sale of the lots in 1894 and to lot 6 upon tax deeds subsequently issued. The Harts have been in the actual possession of the lots since the issuance of the tax deeds, or at least down to the time that the Delpheys went into possession (as squatters according to plaintiff's claim) in November of the year 1902. Since that time there has

been a controversy over the title to the lots which resulted in this litigation. It seems that the lots in question were at one time selected for the county as swamp lands by one named Sargent; but this list was canceled and superseded by one made for the county by one Jarrett, a surveyor and county selecting agent, and Jarrett made an entry on the back of his list as follows:

| Part of Sec. | Sec. | Twp. | Range. | No. of Acres. | |
|---|---|---|---|---|---|
| Lot No. 5 | 26 | 96 | 3 | 56.44 ) | |
| | | | | | Omitted on |
| Lot No. 6 | 26 | 96 | 3 | 26.50 ) | |
| | | | | | opposite page. |
| Lot No. 7 | 26 | 96 | 3 | 29.03 ) | |

As will be noticed, the lots selected by him were in township 96, which the testimony now shows did not exist, but was in fact in the Mississippi river. That the naming of the township was a mistake seems reasonably clear. But here the contest deepens. The General Land Office of the United States, evidently finding some discrepancies, wrote the Des Moines land office the following letter: "Washington, D. C., October 26, 1896. 'K.' SWX. Register and Receiver, U. S. Land Office, Des Moines, Iowa—Sirs: You will please transmit to this office a certified copy of so much of the swamp land selection list, transmitted to the Decorah land office with the Surveyor General's letter of January 12, 1857, as relates to sec. 26, T. 96 N., R. 3 W. and sec. 26, Twp. 97 N., R. 3 W. The document is needed to enable this office to determine in which township the selection was actually made. If your records throw any light on the subject please report the fact in your letter transmitting the copy herein requested. Very respectfully, E. F. Best, Assistant Commissioner."

This was answered by letter from the Des Moines office dated August 9, 1897, which closed as follows: "You will see by the inclosed copy that the Surveyor General's

list shows lots 5, 6, 7, 8, 9, and 10 to be in sec. 26, 96, 3
W., while the plat in this office shows no sec. 26, 96, 3 W.
(said section would come in the Mississippi river), but
shows lots 5, 6, 7, 8, 9, and 10 to be in sec. 26-97-3 W.
The Surveyor General does not show any swamp lands in
sec. 26, 97, 3 W."

This information led to an order canceling the selec-
tion in 26-96-3, and to the following notice by letter ad-
dressed to the Des Moines land office:

Sirs: Included in swamp land selection list No. 3,
Decorah series, received with the Surveyor General's letter
of January 8, 1857, are lots 5, 6, 7, 8, 9, and 10 of sec.
26, T. 96 N., R. 3 W. The official plat of survey of said
township on file in this office, does not show any section 26
(T. 96). The corresponding lots in sec. 26, T. 97 N., R.
3 W. agree in area with those described in said list 3, but,
as the list on file in your office agrees with the one filed in
this office, it can not be held that the selection was for lots
in sec. 26, T. 97 N., R. 3 W. You will advise the proper
state authorities of the facts above stated, and allow them
sixty days within which to show cause why the selection
of said lots in sec. 26, T. 96 N., R. 3 W., should not be
canceled for the reason that no such description exists. In
event of failure to make such showing within the time al-
lowed, or to appeal herefrom, the selection will be canceled,
without further notice. In due time report action in the
matter to this office. (Indorsed on back:) 'Sept. 7, 1897,
sec'y of state and auditor Allamakee Co., Waukon, Ia.,
notified 60 days to appeal, and copy of decision sent by
registered mail.' 'April 20, 1898, reported to G. L. O. no
action taken.'

The Des Moines office gave notice of the cancellation
to the state and to Allamakee county and that unless appeal
was taken within sixty days the same would become final.
No attention was given these notices, and the cancellation
doubtless became final. Neither Hart nor any of the
claimants of the land were given notice of these proceedings,
nor had they any knowledge thereof. In January of the

year 1903, Delphey wrote the General Land Office inquiring
if he could make homestead entry of the lots, and being
informed that he could do so, he (Delphey) made entry
in March of the same year. He was required to make
proof that the land was not swamp, and this he did in the
form of affidavits. His entry was then allowed subject to
a swamp title, and he was required to give notice to both
state and county. This he did, and when the county re-
ceived its notice it turned the same over to Hart as the
real party in interest; he holding title at that time under
the tax deeds hitherto mentioned, although Delphey had
made, or attempted to make, redemption from the sale of
lot 6. The Harts appeared and contested the homestead
entry, and trials were had before the local land commis-
sioner, who decided in favor of the Delpheys, then on
appeal to the Commissioner of the General Land Office,
who reversed the holding of the local land commissioner,
and from the commissioner on appeal to the Secretary of
the Interior, who affirmed the decision of the General Land
Commissioner. The final decision was made March 28,
1907, and among other things it was found:

That Mr. Jarrett selected the lots in sec. 26, T. 97 N.,
R. 3 W. (instead of T. 96) is evidenced by the fact that
the areas of the several lots correspond exactly with those
in sec. 26, T. 96 N., R. 3 W. The same erroneous descrip-
tions, viz., 'Sec. 26, T. 96,' were carried into the Surveyor
General's list of January 8, 1857, reporting the state's
claim. The county was therefore justified in claiming that
the lots in controversy had been selected under the swamp
grant. . . . (States that from all the testimony he
thinks the land subject to overflow during the planting,
growing, or harvesting season so as to injure or destroy a
crop, and was in 1850. Quotes part of original United
States surveyor's notes on this township made in 1849,
showing white and bur oak growing therein, etc. Concludes
the land is higher now than in 1850.) I am also of the
opinion, and so decide, that lots 5, 6, and 7, as well as lots
8, 9, and 10, of sec. 26, T. 97 N., R. 3 W., were, in effect,

embraced in a list of swamp lands reported to this office January 8, 1857, and that the state's claim thereto was confirmed by the act of March 3, 1857, c. 117, 11 Stat. 251. The appeal is sustained, and the lots in controversy are awarded to the state. The homestead entry of Milton O. Delphey, No. 1,419, covering the said lots, is held for cancellation for the reasons above stated. Advise the parties in interest hereof, allow the usual right of appeal, and in due time make full report in the matter to this office.

On motion for review the commissioner made the following findings:

Now that a question on this point (the Jarrett list and the finding thereof) has been raised by the motion for review, the office is ready to concede that the tracts involved in this controversy were not, technically, reported. While it is clear that it was the intention to make selection of the tracts involved, it can not be said that they actually were reported. If the decision of October 16th hinged on this point alone, there might be good ground for considering the decision again. But as the case has been determined upon its merits, and no good ground appears for reviewing the decision on that basis, there is nothing to be gained by a discussion of the effect of the confirmatory act of these lands. If the lands are of the character of lands granted, and have been shown to be such by the testimony adduced at a hearing regularly held for the purpose of determining their character, it can made no difference whether they have been selected or reported as swamp, or not. This office has decided the tracts involved to have been of the character of lands granted, and rests upon that decision. This office can not agree that the doctrine of *res judicata* applies to the tracts in question. There is no record or other evidence that the question of the swampy character of these tracts was ever before considered. The decision of September 3, 1897, did not touch that question. The statement in that decision respecting lands in T. 97 N., R. 3 W., was mere dictum. Any claim which the state or its grantee may have to the lands in T. 96, and not T. 97, was the subject of that decision. For the same reason, the doctrine of estoppel, invoked in the motion, can not be applied in this case. The state's acquiescence in the decision of September

3, 1897, can in no sense be considered a waiver of its claim to anything except the erroneous selections which were the subject of that decision. The contention that neither the state nor the contestants in this case 'had or ever could have had any right to make claim' to the lands involved, as swamp, is not in accord with the view of this office. The fact that these lands were designated as swamp on your plats, and that the Harts claim them under purchase from the state's grantee, was sufficient justification for proceeding under the circular of December 13, 1886, *supra*. The failure of either the state or county to exercise its rights in the premises could not act as a bar to those who derived title through them. It was within the province of the state to have the character of these lands determined by a hearing. The same right inhered in those who claim under the state. (Smith et al. v. Miller, 22 Land Dec. Dep. Int. 372.)

On appeal to the Secretary of the Interior, that official made the following findings:

The errors assigned on appeal are enumerated in eleven specifications, yet the questions submitted for consideration may be summed up as follows: First, that the judgment of your office is contrary to law; and, second, that it is contrary to the preponderance of the evidence in the case. The matters set out in support thereof are largely a repetition of those urged in support of the motion for review denied by your office. (In considering first question presented, decision recites situation of these and adjoining island lands; swamp selections thereof, excepting in sec. 26-97-3; selections in 26-96-3, by Jarrett, by insertion on different page as recited in commissioner's decisions [see Ex. 111 above]; and cancellation of such selection in sec. 26-96-3 by decision of September 3, 1897, made final in April, 1898, after due notice to county and state.) It is now strongly urged that this was a final adjudication of any claim of the state or its grantee to the lots in sec. 26, T. 97 N., R. 3 W.; that by acquiescence in the decision of September 3, 1897, they were thereafter estopped to claim the land as swamp; and that such adjudication and cancellation being conclusive of the swamp claim under that selection, the government is likewise estopped to again consider such a claim. (Decision states that the depart-

ment can not concur in this contention; that such proceeding was one to clear the records of a claim to nonexisting lands. This action canceled such selection, but did not determine the character of other land, and what was said as to land in section 26-97-3 was dictum. 'The intent of that decision is made clear by the language of your office letter of April 29, 1898, making final the cancellation of selection of said lots in T. 96 N., and the acquiescence of the state therein can not be construed as a waiver of any claim it may have to lands in T. 97 N., under its swamp land grant.' Further refers to reasons for believing that Jarrett intended to select lands in T. 97 instead of T. 96, because of identity of number, area, etc., of lots mentioned, and the nonexistence of any such lots in sec. 26, T. 96, whereas similar lots existed in sec. 26, T. 97 N.) But whether this action on the part of the state in the particulars indicated with respect to said list amounted to · a 'selection' of swamp lands within the confirmatory provisions of the Act of March 3, 1857, 11 Stat. 251, it is unnecessary to determine, in view of the finding hereinafter made, upon the record, as to the character of the lands involved. As to the contention, substantially, that the affidavits filed by Hart were not sufficient upon which to base this proceedings, your office correctly held that: 'The fact that these lands were designated as swamp on your plats, and that the Harts claim them under purchase from the state's grantee, was sufficient justification for proceeding under the circular of December 13, 1886, *supra*. The failure of either state or county to exercise its rights in the premises could not act as a bar to those who derived their title through them. It was within the province of the state to have the character of these lands determined by a hearing. The same right inhered in those who claim under the state.' *Smith v. Miller,* 22 Land Dec. Dep. Int. 372. Relative to the argument respecting the character of sufficiency of the title to these lots claimed by contestants, it need only be said that this is not a matter for the consideration of this department, but rather one for the arbitrament of the courts. (Decision then briefly reviews the evidence, and concurs with the commissioner that it thereby appears that the lands are swampy in character so as to pass by the grant of September 28, 1850.) With this

modification the judgment of your office is affirmed. The homestead entry of Delphey is hereby canceled, and the lots in controversy awarded to the state.

On motion for review, the Secretary made the following findings; the same being addressed to the Commissioner of the General Land Office:

As held by your office and the department, the failure of the state or county to exercise its rights in the premises could not act as a bar to those who derived title through them. . . . This land is of the character contemplated by the swamp land grant, . . . and that such must have been its character at the date of the grant, as appears from the evidence of record. No speculation was indulged as to the character or sufficiency of the title to these lots claimed by the contestants. The same may also be said as to the other party or parties claiming title through the state or its grantee. As was correctly said, this is not a matter for the consideration of this department, but rather one for the arbitrament of the courts.

Following these findings and decisions, a patent issued to the state, as before indicated. The first of the cases now at bar was commenced while the homestead contest was pending; but the case did not reach the district court for trial until April 1, 1910. On January 19, 1905, M. O. Delphey attempted to redeem from the tax sale of lot 6 to W. S. Hart on December 2, 1901, and the county treasurer issued a certificate of redemption reciting that: "M. O. Delphey had that day redeemed the undivided 59/60 of lot 6, sec. 26-97-3 (26½ acres), from sale to W. S. Hart on December 2, 1901; that the sale was for 95 cents for delinquent taxes of 1899 and 1900; and that Delphey had paid in redemption thereof the sum of $1.29 in full of sale, penalties, interest and costs," etc.

As soon as Hart learned of this redemption, he gave notice to the county auditor and county treasurer, "reciting that the pretended redemption of the undivided 1/60 of lot 6, sec. 26-97-3, from sale for taxes to Wm. S. Hart

on December 3, 1900, by M. O. Delphey, made about January 19, 1905, is null and void, 'for the reason that the said Delphey, either himself or as agent, attorney or representative, has no interest, title, ownership, lien, equity, or claim of any kind or nature whatsoever,' in or to said land or any part thereof, and said officers should deal therewith as though no such attempted redemption had been made from said sale; that the certificate of tax sale is still valid and outstanding and held by Wm. S. Hart."

Thereafter and on November 27, 1908, the county treasurer made a written statement to the effect that: "Wm. S. Hart had tendered to surrender his certificates at tax sale of following described property: Undivided 1/60 of lot 6 in sec. 26-97-3 sold Dec. 3, 1900, and undivided 59/60 of said lot 6 sold Dec. 2, 1901. 'And that I have now and heretofore refused said tender and demand because of my understanding that the books at my office show the said premises to be redeemed from each of said sales.' "

Taxes for the years 1908 and 1909 upon all the lots were paid by the Delpheys. On August 7, 1908, Hart gave defendants Delpheys notice of expiration of period of redemption from the tax sales of lot 6, both of the 1/60 and the 59/60; but the county treasurer refused to make deeds and gave the written statement before set out. W. S. Hart then brought his suit to set aside the redemptions from tax sale and to quiet his title and to require the execution of tax deeds to lot 6. Upon the trial of the case in the district court, one Collins, deputy auditor of the county from 1880 to 1884, and auditor from 1884 to 1896, testified that these lots were not assessed at all, and that if assessed it was through mistake, and that he canceled the assessments. He also testified that as auditor he returned to one Kletts $27 purchase money paid for the lots because no deed was ever produced showing that they had passed from the county. He also testified that one Hubert Guthneck made demand for a deed. There were also introduced

the following receipts: One given by H. L. Johnson, Collins' successor as county auditor, "for cash deposited by H. Guthneck to purchase island in 97-3. $21.73." Collins also testified that his predecessor turned over money to him which had been paid by William Kletz and Hubert Guthneck for the land in controversy, and that as he found the county had no title and could not make a deed, he so informed the parties, and finally paid Kletts back his money, but refused to pay Guthneck because he had no receipt that he turned his money over to his successor, taking his receipt as before indicated, and as already shown. Guthneck finally received from the county auditor December 29, 1909.

Guthneck was also a witness, and he testified as follows:

Once had an interest in lot 7, one of those where Mr. Delphey lives. This was so long ago I can't remember the date. It was the government land. Mr. Ryan, then county treasurer, told me I need not pay taxes on it; that he couldn't give me a deed for it, and I needn't pay any taxes on it. I paid $1.25 an acre for it, if I am not mistaken. Held it for several years, and at last one of the Daytons (not any of the lawyer Daytons) came at me and wanted me to buy it, to pay $15 for it, and I told him I had already paid for it and he has no right to collect anything from me for that lot. I never tried to get a title for the lot. I did not get a title or my money back. I remember when Mr. Collins was county auditor. Don't remember now whether I demanded my money from him or not. Got a little hay off of the lot. Held it as long as I thought I owned it. Did not know I had no right to it until Mr. Dayton came to me as above stated. This was 34 or 40 years ago. Since then have exercised no ownership over it. Once when the supervisors were down to Harpers Ferry on public business in a body, I told them about it, and that I wanted my money back. This was verbal, not written. They made no effort to get me my money, and I never received anything. The talk with the supervisors was some years ago. Q. The man you paid this

money to was John Ryan, county treasurer, was it? A.
I think it was; yes, sir.

The Delpheys claim to have made some improvements
upon the land, but the extent thereof they much exagge-
rated.    These improvements were described as follows:
"When I was there before the trial of the contest, I noticed
some shanties and tents the clammers used, and a chicken
house made of poles, and a hogpen, and the house; there
were some short two by fours set up, either in the ground
or attached to a frame.    Two men could easily have built
the poultry house, hogpen, and set up the two by fours in
one day or less."

Such is the unusual and complicated record in the case,
eliminating all extraneous matter.    Going now to the mer-
its, we are bound, we think, by the final
decision of the Land Department to hold
that the lands were not subject to home-
stead entry, and that they were in fact
swamp and subject to selection by the county as such.
*Brown v. Hitchcock,* 173 U. S. 473 (19 Sup. Ct. 485, 43
L. Ed. 772), and cases cited.

1. PUBLIC LANDS: decisions of interior department: con- clusiveness.

And under previous decisions construing the swamp
land grant, we must hold that the grant of 1850 (Act
Sept. 28, 1850, chapter 84, 9 Stat. 519) was a present
one, but that the legal title remained in the general gov-
ernment until selection by the counties for the purposes of
identification, and that until such selection no title in fact
passed to the county.    *Tubbs v. Wilholt,* 138 U. S. 134 (11
Sup. Ct. 279, 34 L. Ed. 887).

But the right to the legal title emanates from the grant
itself, and, when the legal title is obtained, it as a general
rule relates back to the grant itself.    *Chandler v. Mining
Co.,* 149 U. S. 79 (13 Sup. Ct. 798, 37 L.
Ed. 657); *McCormick v. Hayes,* 159 U. S.
346 (16 Sup. Ct. 37, 40 L. Ed. 171);
*Brown v. Hitchcock,* 173 U. S. 473 (19 Sup. Ct. 485, 43

2. SAME: swamp lands: grant: title.

L. Ed. 772); *Young v. Charnquist,* 114 Iowa, 116; *Ogden v. Buckley,* 116 Iowa, 352; *Carr v. Moore,* 119 Iowa, 152; *Rogers Locomotive Works v. Emigrant Co.,* 164 U. S. 559 (17 Sup. Ct. 188, 41 L. Ed. 552). In the latter case it is said: "While, therefore, as held in many cases, the act of 1850 was *in praesenti,* and gave an inchoate title, the lands needed to be identified as lands that passed under the act; which being done, and not before, the title became perfect as of the date of the granting act." In *Wright v. Roseberry,* 121 U. S. 488 (7 Sup. Ct. 985, 30 L. Ed. 1039), the court said: "The result of these decisions is that the grant of 1850 is one *in praesenti,* passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the Secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted."

But this doctrine of relation back to the date of the grant does not of itself validate tax sales during the time the title is in either the government or the county, for so long as the title stands in either it is exempt from taxation. *Hussman v. Durham,* 165 U. S. 144 (17 Sup. Ct. 253, 41 L. Ed. 664); *Sargent v. Herrick & Stevens,* 221 U. S. 404 (31 Sup. Ct. 574, 55 L. Ed. 787); *Grant v. Iowa R. R. Land Co.,* 54 Iowa 677; *Reynolds v. Plymouth Co.,* 55 Iowa, 93. In *Hussman's* case it is expressly held that the doctrine of relation can not be invoked to give effect to the wrongful taxation of land while both the legal and the equitable title were in the United States. Until the United States issued its patent to the state, the legal title to the land in controversy was in the United States government, and the right of either the state or the county to tax it did not exist, unless it appears that the equitable title was in the state or county, and not then unless the title, legal or equitable, had passed from the state and county, for so long as it remained in either the

3. SAME:
taxation.

state or county, it was exempt from taxation. *Iowa County v. Story County,* 36 Iowa, 48.

Under the facts above recited with reference to the selection of the lots, we are disposed to agree with the decisions of the land commissioners and the Secretary of the Interior in holding that the equitable title to the land passed to the state and in virtue of the statutes of the state to the county, and that the general government held the same in trust for the state or county.

4. SAME: swamp land grant: effect.

It is very clear, we think, that the Delpheys took nothing under the homestead entry; but Mrs. Delphey holds the paper title from the county under the quitclaim deed to her after the issuance of the patents. She is not herself estopped from challenging plaintiff's title because of the contest over the homestead entry, nor by reason of any other act on her part, although her husband might be if he were asserting any right in virtue of his purchase from the county after the patents were issued.

5. SAME: conflicting titles: estoppel.

Indeed, the estoppel pleaded by plaintiffs, and so strongly relied upon by them, growing out of the defendants Delphey's conduct, is of no avail because they must recover, if at all, upon the strength of their own title, and not because of any weakness of that under which their adversaries claim. This proposition is too fundamental to require citation of authorities.

Having found that the equitable title to the land was in the state or county, still the plaintiffs are not entitled to rely upon their tax deeds, unless it be shown that, during the years for which the lands were taxed, both state and county had parted with their titles, or that they so conducted themselves with reference to the lands that they remain the owner of the lots. Having passed all its swamp lands to the counties, whatever equitable title the state had, passed

6. SAME: tax title to swamp land: proof.

to or really belonged to the county, so that the final inquiry here is: Did the county sell these lots or any of them? And, if not, has it so treated them that it has estopped itself from claiming title thereto?

While by reason of lapse of time the testimony is obscure upon this proposition, we think there is enough to show that the county sold what is known in this record as
**7. SAME: estoppel.** lot 6, which it appears was sold to Millett and Williams, March 8, 1864. The county proceeded to tax the land as having been sold, and so far as shown kept the money which it received from the sale of the lots, to wit, $33.62, and still holds the same. The record also discloses that there was no sale of either lots 5 or 7; that there was some kind of a deposit upon them which in neither case amounted to a sale; that neither of the sales were ever consummated, but the money was returned to the depositors because the county could not give title. It is true that the testimony as to some of these matters is not very explicit, but we think it establishes the facts as we have found them to be.

As the county sold lot 6 and received the money therefor, which it still retains, and as it treated the lot as sold by regularly listing and assessing the same, we think it is estopped from saying that the lands had not in fact been sold and were not subject to taxation. As Mrs. Delphey holds under a quitclaim deed from the county, she acquired no greater rights than the county, and is also estopped from asserting title to lot 6 under her quitclaim deed from the county.

The attempted redemption from the tax sales by Mr. Delphey is of no validity because he had no such title or interest in or to the lands as would authorize him to redeem.

As to lots 5 and 7, the county did nothing which estopped it from claiming title under the patents from the general government and from the state. There is no testi-

mony that it ever sold them.  The most that can be claimed

**8. SAME.** is that it made some kind of an executory contract of sale for each of the lots which was never carried out by the purchasers.  It kept the deposits intact and finally refunded them to the proper purchasers.  These purchasers did not hold even an equitable title to the lots.  All that the county did was to levy assessments against them and to sell the same at tax sales for small amounts.  The mere levy of taxes and sale of lands has many times been held not to estop either the county or state.  *Young v. Charnquist,* 114 Iowa, 116; *Howard Co. v. Bullis,* 49 Iowa, 519; *Buena Vista Co. v. Iowa Falls Co.,* 46 Iowa, 226; *Bixby v. Adams Co.,* 49 Iowa, 507.

It must be remembered, in this connection, that neither of the plaintiffs is claiming title from the county by reason of any sales made by it of its swamp lands.  Their

**9. TAXATION: sales: caveat emptor.** titles are based upon tax sales, and a purchaser at tax sales gets nothing through his purchase if the lands were not subject to taxation.  In other words, the doctrine of *caveat emptor* applies to such a purchaser.  *Games v. Stiles,* 14 Pet. (U. S.) 322 (10 L. Ed. 476).

The cases relied upon by appellees upon the question of estoppel are not in point, as an examination will show.  They are distinguished in the cases we have cited and need not be more specifically referred to.

In the first case a judgment and decree was given for N. M. Hart, quieting title to lots 5 and 7, and rendering judgment for plaintiff in the sum of $300.  This seems to be erroneous, and it must be, and it is, reversed.  In the second case brought by W. S. Hart, there was simply a decree for the plaintiff without any judgment except for costs.  This decree seems to be correct, and it is affirmed.  The costs will be equally divided between appellants and appellees.

First  case  *reversed  and  remanded.*    Second  case *affirmed.*