# IN THE SUPREME COURT OF IOWA

No. 73 / 04-1232

Filed October 6, 2006

**BILL FENNELLY, SCOTT COUNTY TREASURER,**

Appellant,

vs.

**A-1 MACHINE & TOOL CO.,**

Appellee.

---

Appeal from the Iowa District Court for Scott County, John Nahra, Judge.

The Scott County Treasurer appeals from an adverse summary judgment holding that some of his claims for delinquent property taxes were barred by the statute of limitations, and the remaining claims failed due to failure to perform a condition precedent. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Thomas C. Fritzsche, Assistant County Attorney, for appellant.

John T. Flynn of Brubaker, Flynn & Darland, P.C., Davenport, for appellee.

**CADY, Justice.**

In this appeal, we must primarily decide if an action by a county treasurer to collect delinquent property taxes is subject to the statute of limitations, and if a tax sale certificate is a condition precedent to such an action when the parcels for which taxes are delinquent consist of machinery and equipment. The district court granted summary judgment to the taxpayer, and the treasurer appealed. Upon our review, we conclude the action is not barred by the statute of limitations, and a tax sale certificate was not a condition precedent to bringing this action. We affirm the district court in part, reverse in part, and remand for further proceedings.

## I. Background Facts and Proceedings

A-1 Machine & Tool Co. ("A-1") is an Iowa corporation. It owned or leased certain industrial metalworking machinery, which was treated as a taxable real property parcel by the Scott County Assessor from 1989 to 2001. The Scott County Auditor levied taxes on the parcel each of those years. A-1 never paid the taxes. Its president, Alvin Roggenkamp, claimed the corporation never received any tax bills or notices that taxes were owed. The taxes were deemed delinquent by the Scott County Treasurer, Bill Fennelly (the "Treasurer"). He eventually obtained a tax sale certificate for the taxes from 1989 to 1996, but did not obtain a certificate for the taxes from 1997 to 2001.

The Treasurer did not file an action to collect the delinquent taxes until July 18, 2003. At that time, he filed a petition in district court to recover a personal judgment against A-1 under Iowa Code section 445.3 (2003).

A-1 answered the petition and alleged a variety of defenses to the claim. These defenses included: (1) the property composing the taxed

parcel was personal property, not real property, and thus the Treasurer could not collect taxes on the parcel;[1] (2) a personal judgment

---

[1] In Iowa, all real property not exempt is subject to property tax. Iowa Code § 427.13. Importantly, "real property," for purposes of taxation, encompasses more than is covered by the traditional definition of real property—land and fixtures. *See Black's Law Dictionary* 1234 (7th ed. 1999) ("Land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land."). The statutory definition of "real property" encompasses these things, *see* Iowa Code § 427A.1(1)(*a*) ("Land and water rights."), (*b*) ("Substances contained in or growing upon the land . . . ."), (*c*) ("Buildings, structures or improvements, any of which are constructed on or in the land, attached to the land . . . ."), (*d*) ("Buildings, structures, equipment, machinery or improvements, any of which are attached to the buildings, structures, equipment, machinery or improvements defined in paragraph "*c*" . . . ."), but it also includes other items, such as "[m]achinery used in manufacturing establishments," *id.* § 427A.1(1)(*e*), and "computers," *id.* § 427A.1(1)(*j*)(1). The latter two categories of property have had a special valuation scheme since 1995, *see id.* § 427B.17, but they are still defined as real property. Personal property is not subject to property tax in Iowa. *See id.* § 427A.2.

The County claimed in its petition that A-1 owed delinquent taxes on a parcel consisting of "machinery and equipment." In its answer, A-1 claimed, as an affirmative defense, that the machinery and equipment described by the County was not taxable as real property because it was not "attached" to the building. *See id.* § 427A.1(1)(*d*) ("Buildings, structures, equipment, machinery or improvements, any of which are *attached to the buildings, structures, equipment, machinery or improvements defined in paragraph "c" . . . .*" (Emphasis added.)); *id.* § 427A.1(2) (" '[A]ttached' means any of the following: *a.* Connected by an adhesive preparation. *b.* Connected in a manner so that disconnecting requires the removal of one or more fastening devices, other than electric plugs. *c.* Connected in such a manner so that removal requires substantial modification or alteration of the property removed or the property from which it is removed."); *id.* § 427A.1(3) ("Notwithstanding the definition of "*attached*" in subsection 2, property is not "*attached*" if it is a kind of property which would ordinarily be removed when the owner of the property moves to another location."). The County then shifted gears in its motion for summary judgment and argued that even if this were so, the property making up the parcel was still taxable as "computers" under section 427A.1(1)(*j*). The definition of "computers" does not require the computer to be attached to the land or building in order to be taxable as real property. *Id.* § 427A.1(1)(*j*).

We note these arguments must usually be made initially before the board. *See id.* § 441.37(1)(*c*) (stating a taxpayer may protest the assessment of property to the board of review on the grounds that "the property is not assessable, is exempt from taxes, or is misclassified"); *Read v. Hamilton County*, 231 Iowa 1255, 1265, 3 N.W.2d 597, 602 (1942) (" 'The failure of a person aggrieved by the assessment of his property to appear before the board of review and make complaint waives his right to subsequently complain of any irregularity in the listing and assessment thereof. The attempt of the county treasurer to collect a void tax *may*, however, be enjoined by a court of equity.' " (emphasis added) (quoting *Griswold Land & Credit Co. v. Calhoun County*, 198 Iowa 1240, 1242-44, 201 N.W. 11, 12 (1924))). We will refer to the property composing the subject parcel as machinery and equipment in this opinion.

could not be entered for delinquent taxes levied prior to 1992 because the statute authorizing a personal judgment for delinquent property taxes did not go into effect until that year; (3) all the Treasurer's claims were barred by laches and estoppel; (4) claims for taxes that became delinquent prior to 1997 were barred by the statute of limitations; and (5) the claims for the 1997–2001 taxes were barred because the Treasurer did not first obtain a tax sale certificate.

Both parties filed motions for summary judgment. A-1 sought to have the petition dismissed based on the strength of its defenses. The Treasurer also sought to adjudicate the viability of the defenses so that the action could proceed to judgment on its claim.

The district court granted summary judgment for A-1. It held the claims by the Treasurer for taxes levied prior to 1997 were barred by the five-year statute of limitations. It further held that the claims for taxes after 1997 were required to be dismissed because the Treasurer failed to obtain a tax sale certificate prior to instituting the action. Although these holdings disposed of all of the tax claims, the district court further held that the defense of laches was not available to A-1, and that the estoppel defense asserted by A-1 relied upon disputed facts that made it improper for adjudication by summary judgment. The district court subsequently dismissed the petition.

The Treasurer appeals from the decision by the district court. First, he claims a treasurer is immune from the statute of limitations when bringing an action on behalf of a county to collect delinquent real property taxes. Second, he claims a tax sale certificate is not a condition precedent to an action for a personal judgment for delinquent property taxes. Finally, he claims the district court erred by failing to adjudicate the other defenses asserted by A-1 as requested in his motion for

summary judgment. A-1 requests the case be remanded to the district court for consideration of common law attorney fees for defending the action in district court and on appeal. Alternatively, A-1 requests an award for appellate attorney fees.

## II. Standard of Review

Our review in summary-judgment appeals is for correction of errors at law. *Stewart v. Sisson*, 711 N.W.2d 713, 715 (Iowa 2006) (citing *Otterberg v. Farm Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 27 (Iowa 2005)).

> A motion for summary judgment should only be granted if, viewing the evidence in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Otterberg*, 696 N.W.2d at 27 (quoting Iowa R. Civ. P. 1.981(3); citing *Wernimont v. Wernimont*, 686 N.W.2d 186, 189 (Iowa 2004)).

We normally review the district court's decision to award or not to award attorney fees for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). However, "[t]he standard of review for an award of common-law attorney fees is de novo." *Wolf v. Wolf*, 690 N.W.2d 887, 896 (Iowa 2005) (citing *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc.*, 510 N.W.2d 153, 158 (Iowa 1993)).

## III. Statute of Limitations

Limitations on the time to bring an action in Iowa are generally governed by chapter 614 of the Code. This chapter provides a number of special limitation periods for various types of actions, and includes section 614.1(4), which provides:

> Actions may be brought within the times herein limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially declared:
>
> . . . .
>
> 4. *Unwritten contracts—injuries to property—fraud—other actions.* Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years, except as provided by subsections 8 and 10.

Iowa Code § 614.1(4).[2]   None of the special limitations provisions in chapter 614 applies to a claim to collect delinquent taxes.  *See id.* (stating the limitations period, "except when otherwise specifically declared" for "all other actions not provided for in this respect").  *See generally id.* ch. 614.  Additionally, the parties agreed that the chapter of the Code governing tax collection does not contain a special limitations period.  *See id.* § 445.3 (stating an action by the county treasurer for the collection of delinquent taxes "shall be in all respects commenced, tried, and prosecuted to final judgment the same as provided for ordinary actions").  *See generally id.* ch. 445.  Without a special limitation period provided by a statute, the "default" five-year statute of limitations found in section 614.1(4) normally applies.  *See id.* § 614.1(4) (stating "all other actions not otherwise provided for" shall be brought within five years).  A-1 claims this statute precludes the Treasurer from bringing claims for delinquent taxes levied prior to 1997.

The Treasurer asserts the statute of limitations does not apply to this action under the doctrine of *nullum tempus occurrit regi.*  The literal translation of this ancient maxim is "no time runs against the King."

---

[2]Subsections 8 and 10 govern claims for wages and malpractice, respectively, and thus are not applicable in this case.  Iowa Code § 614.1(8), (10).

*Black's Law Dictionary* 1669 (7th ed. 1999). The doctrine originated in the English common law as a declaration that the statute of limitations could not be applied against the Crown. *See United States v. Thompson*, 98 U.S. 486, 489 (1878) ("The rule of *nullum tempus occurrit regi* has existed as an element of the English law from a very early period. . . . The common law fixed no time as to the bringing of actions. Limitations derive their authority from statutes. The king was held never to be included, unless expressly named. No laches was imputable to him. These exemptions were founded upon considerations of public policy. It was deemed important that, while the sovereign was engrossed by the cares and duties of his office, the public should not suffer by the negligence of his servants."). The rationale for the doctrine was that public rights should not be lost by the oversight or neglect of governmental representatives to whom the rights have been entrusted. *Id.* The idea was to make the sovereign immune from the statute of limitations in order to preserve public rights. 51 Am. Jur. 2d *Limitation of Actions* § 78, at 500–01 (2000).

The doctrine was promptly imparted to our American justice system as one of the incidents of sovereignty, *see Thompson*, 98 U.S. at 489–90 ("When the colonies achieved their independence, each one took these prerogatives, which had belonged to the crown; and when the national Constitution was adopted, they were imparted to the new government as incidents of the sovereignty thus created."), and has been a fixture in our jurisprudence in Iowa for over 130 years, *see Des Moines County v. Harker*, 34 Iowa 84, 85 (1871) ("[W]e do not understand counsel upon either side to controvert the propositions that a statute of limitations will not apply to the State unless expressly so stated in it, following the common-law maxim, '*nullum tempus occurrit regi.*' "). Thus,

in Iowa, it is well recognized that a statute of limitations does not run against the state unless specifically provided by statute.[3]  *See, e.g., In re*

---

[3]While the language of the default limitations period in section 614.1(4) applies to "all other actions," we must interpret the statute to determine whether the legislature intended to include actions by the state or a subdivision.  *See Worth County Friends of Agric. v. Worth County*, 688 N.W.2d 257, 264 (Iowa 2004) ("Our primary concern in interpreting a statute is to determine and effectuate the legislature's intent." (citing *Grundmeyer v. Weyerhaeuser Co.*, 649 N.W.2d 744, 750 (Iowa 2002))).  The "all other actions" catchall has been in the statute since 1851.  *See* Iowa Code § 1659(3) (1851) ("The following actions may be brought within the times herein limited respectively after their causes accrue, and not afterwards except when otherwise specially declared, that is to say: . . . Five years.  Those founded on unwritten contracts, those brought for injuries to property or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect.").  This court's contemporaneous interpretations of the statute interpreted the phrase to exclude actions by the state, following the common-law doctrine of *nullum tempus*.  *See Schaer v. Webster County*, 644 N.W.2d 327, 336 (Iowa 2002) ("We will not interpret a statute to be inconsistent with our common law principles absent a clear intent." (citing *State v. Carter*, 618 N.W.2d 374, 377 (Iowa 2000); *State v. Pace*, 602 N.W.2d 764, 771 (Iowa 1999))); *accord Rieff v. Evans*, 630 N.W.2d 278, 285 (Iowa 2001) (" 'We are obliged . . . to interpret statutes in conformity with the common law wherever statutory language does not directly negate it.' " (quoting *Rowedder ex rel. Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 452 (Iowa 1988))); *Woodbury County v. City of Sioux City*, 475 N.W.2d 203, 205 (Iowa 1991) ("[W]e are obligated 'to interpret statutes in conformity with the common law wherever statutory language does not directly negate it.' " (Citation omitted.)); 2B Norman J. Singer, *Statutes and Statutory Construction* § 50:1, at 140 (6th ed. 2000) ("Absent an indication that the legislature intends a statute to supplant common law, the courts should not give it that effect.").

Moreover, in over 130 years of our applying *nullum tempus* to our statute of limitations, the legislature has never taken action to abrogate this interpretive approach or otherwise contradict the doctrine or make the limitation period specifically applicable to the sovereign.  *See* 2B Singer § 49:10, at 112 ("A number of decisions have held that legislative inaction following a contemporaneous and practical interpretation is evidence that the legislature intends to adopt such an interpretation.").  This is, of course, not conclusive of legislative intent, but it is some evidence.  The fact that the legislature has left the statute of limitations untouched is, however, very persuasive evidence given that the legislature has been active in taking steps to put the state on the same level as private litigants by, for example, abrogating the doctrine of sovereign immunity except as provided in the Iowa Tort Claims Act.  *See Hawk v. Jim Hawk Chevrolet-Buick, Inc.*, 282 N.W.2d 84, 91 (Iowa 1979) (LeGrand, J., dissenting) ("Legislative inaction following an opinion placing judicial interpretation on a statute is some evidence that the legislature accepts our view as correct. When the legislative silence continues *in an area of legislative activity*, the presumption becomes stronger and stronger as time advances.").  This discussion, in part, reveals that the doctrine of *nullum tempus* in Iowa is actually a rule of statutory construction.

*Peers' Estate*, 234 Iowa 403, 411, 12 N.W.2d 894, 898 (1944) ("[A] general statute of limitations does not apply to the State of Iowa." (citing *Des Moines County*, 34 Iowa at 84; *Kellogg v. Decatur County*, 38 Iowa 524 (1874); *Manatt v. Starr*, 72 Iowa 677, 34 N.W. 784 (1887))); *State ex rel. Weede v. Iowa S. Utils. Co.*, 231 Iowa 784, 838, 2 N.W.2d 372, 400 (1942) ("It is well established that neither the plea of laches, nor that of the statute of limitation is of any avail against the general government." (citing *Young v. Charnquist*, 114 Iowa 116, 86 N.W. 205 (1901))); *Perley v. Heath*, 201 Iowa 1163, 1165, 208 N.W. 721, 722 (1926) ("Where an action is brought for the sole benefit of the state, . . . the defense of the statute of limitations cannot be made." (Citations omitted.)); *Payette v. Marshall County*, 180 Iowa 660, 662, 163 N.W. 592, 593 (1917) ("[S]tatutes of limitations do not operate against the sovereign or the government, whether state or federal.").

---

We reject the approach of some other courts, *see, e.g.*, *Shootman v. Dep't of Transp.*, 926 P.2d 1200, 1205 (Colo. 1996); *State ex rel. Condon v. City of Columbia*, 528 S.E.2d 408, 413 (S.C. 2000), that have held the abrogation of sovereign immunity alone was the death knell of *nullum tempus*. *Nullum tempus* is an independent doctrine from sovereign immunity, with independent supporting policy considerations. *See Guaranty Trust Co. v. United States*, 304 U.S. 126, 132, 58 S. Ct. 785, 789, 82 L. Ed. 1224, 1228 (1938) ("Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extend to every citizen, including the defendant, whose plea of laches or limitation it precludes; and its uniform survival in the United States has been generally accounted for and justified on grounds of policy rather than upon any inherited notions of the personal privilege of the king." (Citations omitted.)); *City of Shelbyville v. Shelbyville Restorium, Inc.*, 451 N.E.2d 874, 875-76 (Ill. 1983) ("While sovereign immunity from liability and governmental immunity from statutes of limitation shared a philosophical origin and have the similar effect of creating a preference for the sovereign over the ordinary citizen, we do not believe that the abolition of the first of these doctrines requires abandonment of the second."); *Dep't of Transp. v. Sullivan*, 527 N.E.2d 798, 800 (Ohio 1988) ("[T]he abolition of sovereign immunity by R.C. Chapter 2743 and recent decisions of this court did not serve to strip the state of all the privileges of sovereignty and place it in absolute parity with all other litigants."); *Dep't of Transp. v. J.W. Bishop & Co.*, 439 A.2d 101, 104 (Pa. 1981) (holding the abrogation of sovereign immunity did not require abrogation of *nullum tempus*).

The same considerations that support immunity from limitation periods for the state, however, do not necessarily support immunity for political subdivisions of the state. *See Payette*, 180 Iowa at 664, 163 N.W. at 593 ("The county is not the state, and the reasons upon which the rule '*nullum tempus occurrit regi*' is supposed to rest have little or very restricted application to the minor municipalities of the state." (citing *Perry County v. Selma, Marion & Memphis R.R.*, 58 Ala. 546 (1877))). Cities and counties are not sovereign bodies, but in many aspects, are agencies of the state. *See Reynolds v. Sims*, 377 U.S. 533, 575, 84 S. Ct. 1362, 1388, 12 L. Ed. 2d 506, 535 (1964) ("Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions."); *Mandicino v. Kelly*, 158 N.W.2d 754, 758 (Iowa 1968) ("Political subdivisions of states, such as counties, are not sovereign entities; they are subordinate governmental instrumentalities created by the state to assist in carrying out state governmental functions." (Citations omitted.)).[4] Thus, a different immunity rule applies to political subdivisions of the state. *See* Joseph Mack, Nullum Tempus*: Governmental Immunity to Statutes of Limitation, Laches, and Statutes of Repose*, 73 Def. Couns. J. 180, 188 (2006) (noting that many courts "extend nullum tempus to political subdivisions on a limited basis, refusing to grant the immunity unless the suit is on behalf of the sovereign in a public fashion, rather than in a private or proprietary

---

[4]We recognize our home rule doctrine in Iowa gives a county those powers not reserved by the state. Iowa Const. art. III, § 39A. Yet, this authority to self-govern those areas not governed by the state does not enervate a county's role as an agency of the state.

fashion"). This rule provides that the *nullum tempus* doctrine does not exempt actions by municipalities and counties in Iowa from a general statute of limitations unless the action involves a public or governmental activity, as opposed to a private or proprietary activity. *See Chi. & Nw. Ry. v. City of Osage,* 176 N.W.2d 788, 791 (Iowa 1970) ("General statutes of limitations run against municipalities when they are engaged in proprietary activities. They only enjoy sovereign immunity from general limitation statutes when acting in their governmental capacities." (Citations omitted.)).

The public-private distinction applicable to counties and municipalities is easily stated, but like many other rules, is not always easily applied. The distinction can be difficult to make because, in a sense, every right to sue possessed by a municipality or a county is a public right. *See City of Chi. v. Chi. & Nw. Ry.*, 163 Ill. App. 251 (1911) ("In a sense, every right possessed by a municipal corporation is a public right, and every class of property held by it is held in its public capacity, and for public use."). Thus, most every action by a county or municipality can broadly be viewed as a public or governmental activity. *See* Thomas R. Young, *A Morass of Confusion and Inconsistency: The Application of the Doctrine of* Nullum Tempus Occurrit Regi *in North Carolina,* 28 Campbell L. Rev. 251, 257 (2006) ("Defining exactly what one means when declaring a certain action 'governmental' as opposed to 'proprietary' has not come easily, leading to what one commentator has termed 'a morass of confusion and inconsistency.'" (quoting William L. Prosser et al., *Torts* 626 (8th ed. 1988))).

In Iowa, however, a fairly clear line has been drawn between governmental and proprietary actions. Early in our judicial development of the *nullum tempus* doctrine, we began to focus on the nature and

character of the action to determine if the political subdivision was assisting in the welfare of the state, or merely regulating its internal affairs for the benefit of those within its own boundaries. In doing so, we have formed the distinction between public or governmental activities vis-à-vis private or proprietary activities as a means to determine if the doctrine of *nullum tempus* applies to make a subdivision of the state immune from the general statute of limitations. In *Great Western Insurance Co. v. Saunders*, 223 Iowa 926, 932, 274 N.W. 28, 32 (1937), we rejected a claim by a city that it was immune from the general statute of limitations because it was exercising a governmental function by bringing a law suit to collect municipal court costs. Instead, we found the action was proprietary in nature because it merely involved a collection of a debt that would be placed in the city treasury and used for the benefit of the public within the city boundaries. *Great W. Ins. Co.*, 223 Iowa at 932, 274 N.W. at 31-32. Similarly, in *Payette*, we held that a county was subject to the statute of limitations because its right of action benefited only those within the county. *See Payette*, 180 Iowa at 663, 163 N.W. at 593 ("[W]here the claim made by the county is in its own right or interest, and not in the interest of the state or general public, the limitation is applicable to the same extent as if the action were brought by an individual. . . . The county in this instance is seeking the enforcement of the Payette judgments, not for the use or benefit of the state, nor for the use or benefit of the general public of the state, but solely in its own interest and in the interest of that particular part or fraction of the public within its local jurisdiction."). Likewise, in one of our very early *nullum tempus* cases, we held that the statute of limitations did run against the state, because the state was only a

nominal party, and the action brought was for the ultimate benefit of the county. *State v. Henderson*, 40 Iowa 242, 245 (1875).

On the other hand, when an action by a political subdivision benefits the state, not just the public within the boundaries of the subdivision, the *nullum tempus* doctrine applies, and the county or municipality is not subject to a general statute of limitation as other litigants. In another early *nullum tempus* case extending the doctrine to political subdivisions, we held that the statute of limitations did not apply to an action by a county to collect money owed to a "school fund" because the nature of the action was in effect one by the state. *Des Moines County*, 34 Iowa at 86-87. Along the same lines, we held that an action by a city to remove a squatter from a public street involved the enforcement of rights that benefited the state because the city was exercising its authority over streets and highways delegated by the state. *State ex rel. Schlegel v. Munn*, 216 Iowa 1232, 1237-38, 250 N.W. 471, 473 (1933). Thus, these cases as a whole reveal that the primary issue in determining whether a political subdivision is engaged in governmental or proprietary activity is whether it is seeking to vindicate rights of the state or the citizens of the state as a whole, as opposed to only the citizens within its own jurisdiction.

These cases also reveal that the mission behind the doctrine is to extend immunity from a statute of limitations to a political subdivision when the subdivision is acting in the nature of an arm or instrumentality of the state. *See Payette*, 180 Iowa at 663, 163 N.W. at 593 (stating that when "the county is to be regarded as a mere arm or instrument of the state's sovereignty," *nullum tempus* applies, and the county is "therefore entitled to an exemption from the effect of the statute of limitations"). In such an instance, the sovereign powers of the state are implicated, and

the need to protect rights of the public entrusted to the state comes into focus. *See generally* 51 Am. Jur. 2d *Limitations on Actions* § 86, at 507 (2000) ("An action by a municipality is brought for public purposes only if it is a municipal action arising out of powers that are traceable to sovereign powers of the state that have been delegated to the municipality."). Thus, the distinction between public or governmental and private or proprietary does not focus on whether the enforcement of the right will benefit the public, as opposed to its own corporate enterprise, but on whether it will benefit the public within the state, not just the public within its corporate limits.

A-1 asserts it is unnecessary to quibble over the application of the rule because we have previously determined in one of our early *nullum tempus* cases that an action by a county or municipality to collect taxes does not assert a public or governmental right, and a political subdivision is therefore subject to the general statute of limitations when it brings an action to collect taxes. *City of Burlington v. B. & M. R.R.*, 41 Iowa 134, 141 (1875). In *City of Burlington*, we held that an action by a city to collect taxes was not an action to assert a public or governmental right. *Id.* Instead, we said the city was asserting a proprietary right when it sought to collect a debt from a taxpayer. *See id.* ("The right of the city to maintain this action can only be supported upon the ground that the taxes are debts, property held by it in its proprietary character. It appears in this action in that character, claiming to recover on the ground that the defendant is its debtor upon an obligation created by the assessment and levy of the taxes. In the debt thus created, it has a right of property in its proprietary character.").

However, the *City of Burlington* case cannot be read as a broad declaration that the collection of taxes by a city or county is not a public

activity under the *nullum tempus* doctrine. The collection of taxes in that case was a proprietary activity because of the particular underlying circumstances. In that case, the city only sought to collect taxes levied for municipal purposes, something that benefited the city, but not the state. *Id.* at 138. Thus, the character of the action was to satisfy its own proprietary interests, not the public's interests as a representative of the state. *Id.* at 141; *see also Fitzgerald v. Sioux City*, 125 Iowa 396, 403, 101 N.W. 268, 271 (1904) (holding statute of limitations barred city's claim for municipal grading, paving, and curbing taxes); *Brown & Sully v. Painter*, 44 Iowa at 368, 369 (1876) (holding statute of limitations ran against tax-deed-holders in action to recover the price tax-deed-holders paid for delinquent taxes after the tax deed was declared invalid).

Our cases reveal that the distinction between governmental and proprietary functions largely depends upon the facts of each case, and it is dangerous to apply the distinction with broad strokes. Instead, the true nature and character of the action in each case must be identified. Many factors can be considered, including any constitutional provisions or statutes that address the type of powers exercised by a city or a county in bringing an action, as well as the inherent nature of such power or the underlying activity engaged in by the subdivision. The *nullum tempus* doctrine will apply when the city or county is exercising powers as an agent of the state to promote the interests of the citizens of Iowa.

In this case, a portion of property taxes collected by a county goes to support the public schools within its school districts. *See* Iowa Code §§ 257.3(1) ("[A] school district shall cause to be levied each year, with the school general fund, a foundation property tax equal to $5.40 per $1000 of assessed valuation on all taxable property in the district. The

county assessor shall spread the foundation levy over all taxable property in the district."), 257.4(1) ("A school district shall cause an additional property tax to be levied each year. The rate of the additional property tax levy in a school district shall be determined by the Department of Management and shall be calculated to raise the difference between the combined district cost for the budget year and the sum of the products of the regular program foundation base per pupil times the weighted enrollment in the district and the special education support services foundation base per pupil times the special education support services weighted enrollment in the district."); *see also* Iowa Dep't of Revenue, *An Introduction to Iowa Property Tax* (2006), http://www.state.ia.us/tax/educate/78573.html (noting that 45% of property taxes collected in fiscal year 2005 went to K-12 schools); Lori Reynolds, *Skybox Schools: Public Education as Private Luxury*, 82 Wash. U. L.Q. 755, 756 (2004) ("In most states, in spite of the widespread litigation and legislative reform, the most important single source of revenue for elementary and secondary schools is still the local property tax." (citing Nat'l Ctr. for Educ. Statistics, U.S. Dep't of Educ., *Financing Elementary and Secondary Education in the States: 1997-98*, at tbl. A-1 (1997))). The source of school funding is important because the duty and authority to educate Iowans rests with the state. The duty of the state to establish and supervise a state system of education not only has constitutional origins, but it has been an inherent aspect of state government from the inception of our state. *See* Iowa Const. art. IX, § 12 ("The Board of Education shall provide for the education of all the youths of the State . . . ."). Moreover, a comprehensive statutory scheme exists that defines the role of the state and the state department of education to provide a public education to Iowa's young people. *See generally* Iowa

Code ch. 256. Thus, an action by a county to collect delinquent property taxes benefits the state school system and helps the state in carrying out its mission to provide education to Iowans. In this light, the county, when collecting delinquent property taxes, is engaged in a public or governmental activity. *See* 78 C.J.S. *Schools and School Districts* § 9, at 46 (1995) ("The financial maintenance of the public schools is the carrying out of a state, and not a local or municipal, purpose . . . ."). In assisting the state, the county provides a benefit that extends well beyond its borders, and its efforts contribute to an important public mission affecting all of Iowa. Public rights are at stake, which gives rise to immunity from the statute of limitations that would otherwise prevent the exercise of those rights.

In summary, we conclude that the district court erred in refusing to apply the common-law doctrine of *nullum tempus occurrit regi* and in holding the statute of limitations ran against the Treasurer in this tax-collection action. We hold the district court erred in granting summary judgment to A-1 on the claims for delinquent taxes for the years 1989 through 1996 based on a finding that the claims were precluded by the statute of limitations.

### IV. Tax Sale Certificate

We turn to consider whether the district court properly dismissed the collection claims for the tax years 1997 to 2001 because the Treasurer failed to obtain a tax sale certificate prior to instituting its action. The district court determined the statutory scheme for collecting delinquent property taxes requires the Treasurer to obtain a tax sale certificate as a condition precedent to bringing an action to collect taxes in all cases except those in which the subject parcel is land, and the Treasurer is unable to offer the land for tax sale. Because the parcel in

this case consists of machinery and equipment, not land, the district court found a tax sale certificate was a condition precedent to an action for a personal judgment for taxes on the parcel.

As previously noted, the taxation structure in Iowa includes a tax on real property. Iowa Code § 427.13. The taxation process begins with the county assessor, who values each item of taxable property in the county. *Id.* §§ 441.18–.21. Each taxable item is called a "parcel." *Id.* § 445.1(4). After the property is valued, the taxpayer has an opportunity to protest the assessment to the board of review. *Id.* §§ 441.23, .37. The department of revenue then equalizes the assessments, *id.* § 441.47, and taxing authorities (e.g., cities, counties, school districts, and townships) establish their budgets based on the valuations in the assessments and determine the rate of tax, based on the value of the property, needed to fund their budgets, *id.* §§ 444.1–.3. The county auditor then delivers a tax list computing the total amount due, *id.* § 443.2, to the county treasurer to collect the taxes, *id.* § 443.4.

The taxes generally become delinquent if the first installment is not paid by October 1, and the second installment is not paid by April 1. *Id.* §§ 445.36–.37. If the taxes remain delinquent, the treasurer must offer the parcel at the annual tax sale. *See id.* § 446.7 ("Annually, on the third Monday in June the country treasurer shall offer at public sale all parcels on which taxes are delinquent."). The purpose of the sale is to collect the taxes, interest, fees, and costs due by means of the sale of the parcel to a bidder, or by subsequent redemption. *See generally id.* chs. 446–48. If a bid is received in an amount equal to the total amount due, then the sale ultimately provides a means for the treasurer to collect the delinquent taxes. *See id.* § 446.16(1) ("The person who offers to pay the total amount due, which is a lien on any parcel, for the smallest

percentage of the parcel, is the purchaser . . . .”). If no person bids on the parcel, the county treasurer offers it for sale again periodically (at least every two months) until the next annual tax sale. *Id.* § 446.25. If the parcel remains unsold at the time of the next annual tax sale, the treasurer then offers the parcel at the “public bidder sale,” formerly known as the “scavenger sale.” *Id.* § 446.18. If no person bids on the parcel at the public bidder sale, or the only bid received is for less than the total amount due, “the county in which the parcel is located, through its county treasurer, shall bid for the parcel a sum equal to the total amount due.” *Id.* § 446.19. In this way, the treasurer becomes the purchaser, and receives a tax sale certificate. *Id.* § 446.29. This certificate allows the county to pursue many avenues, including assigning the certificate, *id.* § 446.31, entering into a compromise or abatement agreement, *id.* § 445.16, or assigning the certificate for redevelopment of the parcel as housing in exchange for the amount due, *id.* § 446.19A. Alternatively, the owner of the parcel may redeem the parcel by paying the total amount due. *Id.* § 447.1. If the parcel is not redeemed, the county may acquire title to the parcel through a tax deed. *Id.* § 448.1. The county can then sell the property or dispose of it as provided in section 331.361. *Id.* § 446.19A(4)(*b*).

Additionally, the county may pursue an action to convert the amount due into a personal judgment against the parcel’s owner. *See id.* §§ 445.3 (“In addition to all other remedies and proceedings now provided by law for the collection of taxes, the county treasurer may bring or cause an ordinary suit at law to be commenced and prosecuted in the treasurer’s name for the use and benefit of the county for the collection of taxes . . . .”), 446.20(1) (“Without limiting the county’s rights under section 445.3, once a certificate is issued to a county, a county

may collect the total amount due   by the alternative remedy provided in section 445.3 by converting the total amount due to a personal judgment."). The tax-sale-certificate remedy and the personal-judgment remedy may be pursued simultaneously until the total amount due has been collected. *Id.* § 446.20(1).

However, as a condition precedent to pursuing the personal-judgment remedy, normally, a tax sale certificate must first be issued. *See id.* (stating a county may pursue a personal judgment "*once a certificate is issued*" (emphasis added)); *id.* § 445.3 ("The commencement of actions for ad valorem taxes authorized under this section shall not begin until the issuance of a tax sale certificate under the requirements of section 446.19."). Thus, in order to obtain a personal judgment based on delinquent property taxes, a treasurer must usually (1) offer the parcel at the annual tax sale to collect the amount due, *id.* § 446.7; (2) re-offer the parcel at least every two months until the next annual tax sale (i.e., for one year), *id.* § 446.25; (3) offer the parcel at the public bidder sale, *id.* § 446.19; and (4) bid the total amount due and obtain a tax sale certificate, *id.* §§ 446.19, .29. Obviously, this can be a lengthy process.

However, there is an exception to the requirement for the treasurer to first obtain a certificate of sale before pursuing an action under section 445.3. Section 445.3 provides:

> Notwithstanding any other provisions in this section, if the treasurer is unable or has reason to believe that the treasurer will be unable to offer land at the annual tax sale to collect the total amount due, the treasurer may immediately collect the total amount due by the commencement of an action under this section.

*Id.* § 445.3, para. 5. The district court read this exception as limited to situations when the parcel consists of *land* that the treasurer is unable

to offer for sale at the annual tax sale. We think the exception has broader application for two reasons.

First, the land limitation found by the district court is not derived from the language of the statute. Instead, the limitation was created by the district court from a presumption that the statutory language concerning the inability "to offer land at the annual tax sale" means the land must first exist. However, this presumption overlooks that a parcel subject to taxation as real property can be not only land, but equipment, machinery, computers, and many other types of property. *See id.* § 427A.1 (listing items of property taxed as real property); *see also* 1984 Op. Iowa Att'y Gen. 125 ("Given that real property taxes constitute a lien against the assessed real property of a manufacturing real property unit, any such delinquent taxes can be satisfied by the chapter 446 tax sale. Depending upon the circumstances, the county treasurer may be able to collect delinquent taxes attributable to the machinery by sale of the machinery only."). Given the broad definition of "real property" for purposes of taxation, it is possible for an item of "real property" that is not land to be assessed as a parcel separate from the land on which it sits. Each parcel would then be separately taxed. Therefore, taxes on the "non-land" parcel could become delinquent without the land parcel also becoming delinquent. In this situation, the treasurer would be in a position to offer the non-land parcel at tax sale, but would be "unable to offer land at the annual tax sale to collect the total amount due." *Id.* § 445.3, para. 5.

This situation may commonly occur in the case of leased land, where the landowner remains responsible for paying the property taxes on the land. *See id.* §§ 445.5(5) (stating the treasurer "shall deliver" the statement of taxes due to the *titleholder* of the land); 445.5(2) (stating the

lessee, mortgagee, contract- purchaser, or financial institution is entitled to a statement of taxes due "upon request"). It would not be uncommon for a business owner to lease a building and land to operate a business, but own the machinery, equipment, or computers located in the building. Conversely, a business owner could own the building and land and lease the machinery, equipment, and computers from another person or entity. In both situations, the land and non-land real property would have separate owners, and the property would be separately taxed. Consequently, there would be separate parcels that could ultimately be offered at a tax sale in the event of a delinquency.

This analysis reveals that a county treasurer is unable to sell land at a tax sale when the parcel consists of real property other than land, such as equipment, machinery, or computers. *See id.* § 445.3, para. 5 ("Notwithstanding any other provisions in this section, if the treasurer is unable or has reason to believe that the treasurer will be unable to offer land at the annual tax sale to collect the total amount due, the treasurer may immediately collect the total amount due by the commencement of an action under this section."). Thus, the exception under the statute is not limited by its language to situations in which the parcel is land. The language itself applies to situations in which the parcel offered for sale does not consist of land. This is the precise situation in this case.

Second, the exception would serve little purpose under the interpretation by the district court. There is no readily apparent reason why a county treasurer should be allowed to bypass the tax-sale-certificate procedure in the case of land but not in the case of non-land real property parcels. Conversely, it is clear why the legislature would want to bypass the tax-sale-certificate procedure for non-land parcels but not for land. A treasurer does not bid on a parcel, and obtain a tax

sales certificate for the parcel, until the parcel has been previously offered at a tax sale for one year or more and remains unsold for want of bidders. *Id.* § 446.18-.19. Thus, a substantial amount of time can pass between the offer of a parcel at a tax sale and the issuance of a certificate of sale to the county, which then enables the treasurer to bring a collection action. This passage of time would normally have a greater adverse impact on the value of equipment, machinery, and computers than on land. Equipment, machinery, and computers can depreciate in value much more rapidly than land. This type of property has a limited life, while land does not. Moreover, land is a finite resource, so it always has value. Thus, when a parcel does not include land, it is logical and reasonable to allow the treasurer to dispense with the tax-sale requirements and immediately proceed to file an action to collect the amount due. Without the exception, a treasurer could very well invest great time and effort into obtaining a tax sale certificate on a non-land parcel only to end up with the county getting title to a worthless piece of property in the end. This cannot be what the legislature intended.

We conclude a county treasurer may maintain an action to collect a delinquency on a parcel without first obtaining a certificate of sale when, as in this case, the parcel does not include land. *Id.* § 445.3, para. 5. When a treasurer is not able to sell land at a tax sale to collect delinquent taxes on a parcel, or when the treasurer reasonably believes the treasurer will be unable to sell land, the treasurer may immediately commence an action to collect the amount due on the parcel. *Id.* The district court erred in granting summary judgment for A-1 on this issue.

## V.  Remaining Issues

The district court determined the defense of laches could not be applied in this case, and that the defense of estoppel was not amenable

to adjudication because of the existence of disputed facts. However, it did not address the viability of the remaining defenses asserted by A-1.

Generally, error is not preserved for appeal on issues submitted to the district court but not decided, if the appellant failed to file a posttrial motion requesting the court to rule on the matter. *Teamsters Local Union No. 421 v. City of Dubuque*, 706 N.W.2d 709, 713 (Iowa 2005). Under this rule, the Treasurer failed to preserve error on those issues not decided by the district court. Thus, we will not discuss A-1's defenses at his request.

However, there is another legal principle that permits us to review the viability of the remaining defenses. We may uphold a district court ruling on appeal on grounds not relied upon by the district court if the grounds were presented to the district court. *DeVoss v. State*, 648 N.W.2d 56, 61 (Iowa 2002). Here, A-1 asserted all of its defenses in support of its motion for summary judgment, but the district court only relied upon the statute-of-limitations and tax-sale-certificate defenses. A-1 now seeks affirmance based on the defenses not relied upon by the court. Thus, we must proceed to determine if we can uphold, or partially uphold, the summary judgment based upon the other defenses asserted by A-1.

### A. Effect of Iowa Code Section 427A.10 on Tax Years Prior to July 1, 1994

A-1 claims we can partially uphold the summary judgment because the property assessed by the Treasurer was not subject to taxation for the tax years prior to July 1, 1994. It claims the legislature repealed the tax on personal property during this period of time. However, A-1's reliance on the legislative changes regarding Iowa

property tax from 1987 to 1995 is misplaced. In 1985 the legislature amended section 427A.10 to repeal personal property taxes after July 1, 1987. 1985 Iowa Acts ch. 32, § 105 (codified at Iowa Code § 427A.10 (1987)). Then in 1994 this section was repealed, 1994 Iowa Acts ch. 1173, § 42, and in 1995 the legislature passed "An Act Relating to Nonsubstantive Code Corrections" and enacted, *inter alia*, new section 427A.2, *see* S.F. 87, 76th G.A., Reg. Sess. § 33 (Iowa 1995). Section 427A.2 affirmatively repealed the personal property tax in Iowa. 1995 Iowa Acts ch. 67, § 33 (codified at Iowa Code § 427A.2 (1997)). Whether in 1987, 1995, or any time between or after those dates, however, all tangible property defined as real property under section 427A.1 was subject to taxation. *See, e.g.*, Iowa Code § 427A.1 (1987). The personal property not subject to taxation was only that tangible property not defined as real property under section 427A.1. *Id.* This factual argument is not before us.

### B. Prospective Application of Personal-Judgment Remedy

Prior to 1992, a claim for delinquent taxes in Iowa was only in rem. *Hiskey v. Maloney*, 580 N.W.2d 797, 799 (Iowa 1998). Such claims could not become a personal obligation of any person. *Id.* In 1992, our legislature amended sections 445.3 and 446.20 to create an action for personal judgments. 1991 Iowa Acts ch. 191, § 28. The statutes became effective on April 1, 1992. *Id.* A-1 argues this statutory amendment only applies prospectively, and taxes levied prior to April 1, 1992, the effective date of the statute, cannot be converted to a personal judgment against A-1.

In *Hiskey*, we held that sections 445.3 and 446.20(1) "do not apply to delinquent taxes included in tax sale certificates acquired by a county prior to April 1, 1992." 580 N.W.2d at 799. We reasoned that because

section 445.3 created a new personal liability, it could not be applied retroactively. *Id.* (citing Iowa Code § 4.5 ("A statute is presumed to be prospective in its operation unless expressly made retrospective.")). The *Hiskey* holding is not directly apposite to this case. In *Hiskey*, the dispute concerned taxes that were both levied, and for which a tax sale certificate was issued, before the effective date of the statutes. *Id.* at 797. In contrast, in this case, the tax sale certificate was acquired after the effective date of the statutes, but the 1989-1992 taxes were *levied* before the effective date of the statutes. A-1 urges us to answer the question we left open in *Hiskey*: "whether the statutes are inapplicable to all delinquent real estate taxes levied before their effective date (April 1, 1992)." *Id.* at 799. Although we determined the personal judgment statutes applied prospectively in *Hiskey,* we did not decide which event was relevant in the prospective application of the statute. A-1 claims the relevant event is the date the delinquent taxes were levied, while the Treasurer claims the personal judgment statutes apply to delinquent taxes levied prior to 1992 as long as the tax sales certificate was issued after 1992. We left the question open in *Hiskey,* because it was not necessary to the decision, given that both events occurred before 1992 in that case.

In deciding this question, we turn to the underlying rationale that led us in *Hiskey* to declare that the statute operates prospectively. Statutes that create new rights or obligations, such as personal liability for property taxes, are applied prospectively "as a matter of fairness, so that people have opportunities to know what the law is and to conform their conduct accordingly." 2 Norman J. Singer, *Statutes and Statutory Construction* § 41:4, at 396–97 (6th ed. 2001 rev.); *see also id.* § 41:2, at 375–76 ("It is a fundamental principle of jurisprudence that retroactive

application of new laws is usually unfair. There is general consensus that notice or warning of the rule should be given in advance of the actions whose effects are to be judged. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible concerning law that has yet to exist."). Prior to 1992, property owners in Iowa felt secure in the law that delinquent property taxes levied on real estate could not be converted into a personal judgment against the person. When the law was changed in 1992, this security was lost. From that point in time, a delinquency in taxes levied on real estate could result in a personal judgment. Yet, having found in *Hiskey* that the personal judgment statute must only be applied prospectively, it is clear that the purpose of the prospective application could only be served by using the time when the tax was levied as the commencement date of the statute for the purposes of applying it prospectively. It would be unfair to apply the statute prospectively, but then allow it to reach back in time to collect delinquent taxes levied prior to the effective date of the statute by obtaining a tax sale certificate after the effective date of the statute. The important event is when the tax becomes an obligation. When this occurs, a property owner deserves to know whether or not the obligation can result in a personal judgment. Property owners knew prior to 1992 that the obligation to pay taxes levied on property could not be collected as a personal judgment. This is the important event that prospective application of the statute was intended to protect. It would be contrary to the rationale supporting prospective application of this statute to permit a county treasurer to circumvent the prospective operation of this statute and make ancient taxes the basis of a personal judgment after

the effective date of the statute by merely obtaining a tax sale certificate after the effective date of the statute. The operative action of the taxpayer—nonpayment of taxes—occurred prior to the effective date of the statute. Thus, today we take the next logical step from *Hiskey* and hold that a county treasurer may not obtain personal judgments against defendants for taxes levied before the effective date of the personal judgment statute, April 1, 1992.[5]

## C. Equitable Estoppel

Finally, we turn to consider the claim by A-1 that the Treasurer was estopped to collect delinquent taxes on the property under the defense of equitable estoppel. A-1 claimed that the Treasurer was estopped to collect taxes because it failed to provide A-1 with adequate notice of the assessment and an opportunity to provide information to contest it at the time.

The Treasurer, in its motion for summary judgment, argued this defense was not available in an action at law, and it did not apply to statutory tax collection actions. *See* 31 C.J.S. *Estoppel and Waiver* § 176, at 668 (1996) ("Taxation being a governmental rather than a proprietary function, ordinarily there can be no estoppel against a government or governmental agency with reference to the enforcement of taxes; and statutory tax collection procedure should not be frustrated through the application of the doctrine of equitable estoppel."). The district court denied the Treasurer's motion for summary judgment on

---

[5]Under this standard, the summary judgment granted by the district court would be proper for those tax years in which the taxes were levied prior to April 1, 1992. Under the evidence, this would include the tax claims from 1989 and 1990. However, the parties did not have the benefit of our ruling at the time of the summary judgment proceedings to determine when the taxes for the years 1991 and 1992 were actually levied. On remand, we leave it for the district court to determine which claims for delinquent taxes were levied prior to April 1, 1992 and to enter judgment accordingly.

this point, holding there were genuine issues of material fact on whether the Treasurer "had the duty to collect information from [A-1] concerning this equipment and whether [the Treasurer] provided notice to [A-1] concerning the accrual of these alleged taxes." *See Markey v. Carney*, 705 N.W.2d 13, 21 (Iowa 2005) (listing elements of equitable estoppel as: " '(1) a false representation or concealment of material facts; (2) lack of knowledge of the true facts on the part of the actor; (3) the intention that it be acted upon; and (4) reliance thereon by the party to whom made, to his prejudice and injury' " (quoting *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 606 (Iowa 2004))). The Treasurer seeks reversal of this ruling on appeal.

"We have consistently held equitable estoppel will not lie against a government agency except in exceptional circumstances." *ABC Disposal Sys., Inc.*, 681 N.W.2d at 607 (citing *Bailiff v. Adams County Conference Bd.*, 650 N.W.2d 621, 627 (Iowa 2002)). We have explained that "[a] person seeking to invoke the doctrine of equitable estoppel against a government body 'bears a heavy burden, particularly when the government acts in a sovereign or governmental role rather than a proprietary role.' " *Id.* (quoting *Bailiff*, 650 N.W.2d at 627). The "exceptional circumstances" under which equitable estoppel will lie against the government include instances when, "in addition to the traditional elements of estoppel, the party raising the estoppel proves affirmative misconduct or wrongful conduct by the government or a government agent." 28 Am. Jur. 2d *Estoppel and Waiver* § 140, at 559 (2000).

To determine the viability of this defense, we must examine the specific grounds upon which it is based. In resisting the Treasurer's motion for summary judgment, A-1 explained that its equitable estoppel

defense was based on the failure of the Davenport city assessor's office "to communicate with Alvin W. Roggenkamp to obtain information upon which to obtain a valid tax assessment." It claimed the city assessor's conduct could be imputed to the Treasurer because the assessor acts as an agent.

Even assuming the truth of A-1's factual allegation, and the legal validity of its vicarious-liability theory, A-1's equitable estoppel defense fails as a matter of law. A failure by the assessor to communicate with A-1 does not establish " 'a false representation or concealment of material facts,' " *Markey*, 705 N.W.2d at 21 (quoting *ABC Disposal Sys., Inc.*, 681 N.W.2d at 606), let alone an "exceptional circumstance" that would allow the application of equitable estoppel against the government, *see ABC Disposal Sys., Inc.*, 681 N.W.2d at 607 ("We have consistently held equitable estoppel will not lie against a government agency except in exceptional circumstances." (Citation omitted.)). This defense is not available to A-1 in this proceeding as a matter of law.

### D. Attorney Fees

A-1 requests the case be remanded to the district court for consideration of common law attorney fees for defending the action in district court and on appeal. Alternatively, A-1 requests an award for appellate attorney fees.

There is no statute providing for attorney fees in a tax-collection action, so any award would have to be for common-law attorney fees. *See Capital Fund 85 Ltd. P'ship v. Priority Sys., LLC,* 670 N.W.2d 154, 160 (Iowa 2003) ("We have repeatedly stated that, as a general rule in Iowa, attorney fees are not allowed in the absence of a statute or contract authorizing such an award." (Citations omitted.)); *Hockenberg Equip. Co.,* 510 N.W.2d at 158 ("A party generally has no claim for attorney fees as

damages in the absence of a statutory or written contractual provision allowing such an award. Courts have recognized a rare exception to this general rule, however, 'when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.' " (Citations omitted.)). The standard for an award of common-law attorney fees is as follows:

> A plaintiff seeking common-law attorney fees must prove that the culpability of the defendant's conduct exceeds the punitive-damage standard, which requires "willful and wanton disregard for the rights of another." Instead, "such conduct must rise to the level of oppression or connivance to harass or injure another." Put another way, the standard "envisions conduct that is intentional and likely to be aggravated by cruel and tyrannical motives."

*Wolf*, 690 N.W.2d at 896 (quoting *Hockenberg Equip. Co.*, 510 N.W.2d at 159–60).

Our resolution of this case on appeal reveals any claim for attorney fees is inappropriate. This case is far removed from the rare exception to the general rule against an award for attorney fees. Accordingly, we deny the request for appellate attorney fees made by A-1. Additionally, a claim for trial attorney fees is untimely when made for the first time on appeal. *See Meier v. Senecaut III*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

## VI. Conclusion

The district court erred in granting summary judgment to A-1, except with respect to the Treasurer's claim for a personal judgment on taxes levied prior to April 1, 1992. We reverse the decision of the district court and remand the case for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Carter, J., who concurs in result only.